UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| United States of America | Criminal No. 3:09cr173 (JBA) |
| *v.* | April 5, 2010 |
| Faroulh Dorlette | |

RULING ON DEFENDANT'S MOTION TO SUPPRESS [Doc. # 14]

Defendant Faroulh Dorlette was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). He moves to suppress, as the product of an unlawful search and seizure, a revolver found in his possession on the night of December 24, 2008. The Court held an evidentiary hearing at which four people—the two officers at the scene as well as two of the individuals with Dorlette that night (Dominique Narcisse and Niahson Letang)—testified. For the reasons that follow, Defendant's motion will be granted.

I.      Facts

In the early hours of December 24, 2008, Stamford Police Department ("SPD") Patrol Officers William Edson and Brendan Phillips were on patrol together. Edson was driving their marked police car. Both Edson and Phillips had been with the SPD approximately three years, and were partners for most of that time. (Tr. 5–6 (Edson), 69–70 (Phillips).)

Leonardy Letang ("Letang Sr.") lived with his wife, two sons, and daughter in an apartment in a multi-resident home at 38 Diaz Street in Stamford, Connecticut. At approximately 2:30 a.m. two men came to the apartment and kicked at the door, looking for

his son Niahson Letang ("Letang Jr."). Letang Sr. first called Letang Jr., who was at that point in Port Chester, New York, and then called the SPD. (Tr. 7–9 (Edson); Tr. 155, 157 (Letang Jr.).) Letang Jr. decided to return to 38 Diaz Street to investigate, and arranged to pick up his friends Narcisse and Kenkelly Alphonse to accompany him there. Dorlette, who was staying with Narcisse, came along as well when Letang Jr. arrived at Narcisse's house to pick him up. (Tr. 110 (Narcisse).) Letang Jr. testified that he wanted to bring his friends with him to make sure he was safe when he arrived at the apartment. (Tr. 157 (Letang Jr.).)

After Letang Sr. called SPD dispatch to report the door–kicking incident, at approximately 2:30 a.m. Edson and Phillips were dispatched to the scene. When they reported to 38 Diaz Street, Letang Sr. told them that the two men were African–American, that they were wearing dark clothing (blue jeans and black hooded sweatshirts), that they had kicked at the door, and that he had did not know them and had never seen them before. Edson and Phillips observed boot–print marks on the door, and Letang Sr. told them that he had called Letang Jr. to "notif[y] him of the situation." Edson and Phillips told Letang Sr. that they would canvass the area, asked him to call the police again "right away" if the men returned, looked around, left the scene driving south on Diaz Street, and "[s]quared the block" by turning right onto and going west on Piave Street, then turning right again and going north on West Avenue, then turning right again and going east on West Main Street, and finally turning right and again going south on Diaz Street. (Tr. 10 (Edson).)

2

As they approached the Main Street–Diaz Street intersection five minutes after leaving Letang Sr., Edson and Phillips saw "a dark–colored Acura with tinted windows turn down Diaz Street," and they followed it.  The Acura parked in front of 38 Diaz Street and four African–American men got out of the car.  Edson drove up to them, and through the patrol car window Edson spoke with the Acura's driver, who identified himself as Letang Jr.  According to Edson, their conversation lasted "[m]aybe a minute or two."  Edson told Letang Jr. of the situation, and according to Edson, Letang Jr. "said he was aware of it and that he was coming home to take care of it." (Tr. 12, 13 (Edson); *accord* Tr. 88 (Phillips), 112–13 (Narcisse).)  Edson testified that Letang Jr. appeared "nervous," "didn't want to answer any of [their] questions," and "didn't seem very forthcoming with information" (Tr. 12), but that Letang Jr. answered all of the questions the officers had posed to him (Tr. 88). Edson did not recognize or ask Letang Jr. about the three people accompanying him, and asked Letang Jr. to call the SPD rather than taking care of anything himself.  Phillips testified that in contrast to other people whose front doors have been kicked in, who "want the police there to help them, [Letang Jr.] didn't want anything to do with us.  He kept on walking when we were talking to him, he didn't really stop and give us his full attention. . . . He didn't want our help at all." (Tr. 101 (Phillips).)  The four men were later identified as Letang Jr., Dorlette, Narcisse, and Alphonse.  Edson and Phillips drove away as the four men walked toward 38 Diaz Street.

Edson and Phillips squared the block again, and while they did so, Letang Jr. went into the apartment while Narcisse, Alphonse, and Dorlette waited outside. (Tr. 113 (Narcisse).) When Letang Jr. saw that "everything was fine" at the apartment, including his father, he reported to his friends that he was fine, and told them he would drop them off at their homes and would "'just go home and go to sleep.'" (Tr. 158, 172 (Letang Jr.).) The officers returned just as the four men were returning to Letang Jr.'s Acura. (Tr. at 158–59 (Letang Jr.).) When the officers arrived back at the Main Street–Diaz Street intersection "a minute or two" later, they looked down Diaz Street and saw two African–American men standing in the middle of the street. Edson and Phillips "thought these may be the two suspects looking to fight with [Letang Jr.]," so they turned down Diaz Street and again drove to 38 Diaz Street. The two men in the street did not move, and instead "looked at [the officers], deer in headlights type." According to Edson, "[a]s we got closer we realized it was [Letang Jr.] and his three friends," that is, "the four we had seen earlier." (Tr. 16, 18, 37–38, 40–41 (Edson); *see also* Tr. 76 (Phillips).) Edson testified:

> We decided to exit our patrol vehicle this time because of the fact that it just appeared suspicious to us that they were coming back out again after we, you know, initially told them that — we initially saw them going back into their apartment. We decided to step out and talk to them, see what was going on. It just seemed really suspicious.

(Tr. 17.) It was Edson's "intention . . . to confront" the men (Tr. 42); he testified that they thought the four men were going to find the two men who had been kicking at the door earlier that night (*id.* at 18), but the officers did not ask the four men for identification or

where they were going—or, indeed, any questions at all (Tr. 48, 49, 92).[1]  Phillips testified

that the officers "figured if [Letang Jr.] returned home, it's less than a minute later and he

is going back to his car, we figured he got more information, we thought he was going to

look for the individuals."  (Tr. 78.)

According to Edson, as he and Phillips pulled up, Letang Jr., Narcisse, and Alphonse

acknowledged the officers, but Dorlette "continued to walk away from us, trying to separate

us from him, or him from us. . . . [T]hey all had their hands in their pockets."  (Tr. 18

(Edson).)  Edson testified that "immediately" after getting out of the patrol car, "[b]efore

[they] asked any questions at all," the officers "asked them to show us their hands for officer

safety."  (Tr. 18, 47–48 (Edson).)[2]  None of the four took their hands out of their pockets.[3]

(*Id.* at 18–19.)  Edson testified that Dorlette "was digging in his pocket, basically his rib

pocket, looking like he was trying to get rid of something."  (*Id.* at 18–19.)  Edson testified

that it was not suspicious that Dorlette and the other three men had their hands in their

---

[1] Phillips testified that when they got out of the patrol car the officers "asked [the four men] if they found out any other information, and they just kind of froze" and "appeared to dip their hands in their pockets, almost to tense up," before the officers "asked them to show us their hands just for safety purposes."  (Tr. 78, 79.)  Phillips's testimony is at odds with the testimony of every other witness—including Edson—each of whom testified that the officers did not ask the men any questions before drawing their service weapons and demanding that the men take their hands out of their pockets.  (*See infra.*)  Phillips's testimony on this point will not be credited.

[2] Edson repeated a number of times that his concern was for "officer safety," explaining that "[i]nitially I was concerned about officer safety" even before considering asking any questions.  (Tr. 49; *see also id.* at 19, 24.)

[3] The Government "does not quarrel with the defense observation that because it was a cold morning in late December, the men were entitled to have their hands in their pockets."  (Gov't's Opp'n at 5 n.2.)

pockets in the first place.  Rather, he testified, "what I thought was suspicious was when I told them to remove their hands from their pockets for officer safety and they did not. That's what I thought was suspicious.  It's an officer safety issue."  (Tr. at 47.)  He also testified that he thought it was suspicious that the men were leaving 38 Diaz Street just minutes after they had arrived, but he also agreed that he "hadn't established earlier where they were going or where they all lived" or if they were going to stay at 38 Diaz Street for the night.  (Tr. 43–44.)

Edson agreed that he had not been concerned for his safety when he saw the four men minutes before; he speculated that in those brief minutes, "[p]ossibly they went in[to] 38 Diaz Street to get some sort of weapon to go look for these two individuals that were looking for [Letang Jr.]," but agreed that "[a]nything is possible"—including that the men "didn't even go into 38 Diaz Street"—and that "[t]he only thing that was different between what had happened three minutes earlier and on the third visit was three minutes had passed."  (Tr. 50; *see also id.* at 39–40, 44–45.)  He also agreed that he had no idea why the two men had come to 38 Diaz Street looking for Letang Jr.  (Tr. 35.)  Edson testified that his concern about Dorlette was based on his "going behind the car" and "digging in his pocket," and that "[his] concern based upon these circumstances was officer safety."  (Tr. 50–51.)  He asserted the right of police officers "to ask people to show [their] hands" for officer safety "[w]hen we feel threatened in any way."  (Tr. 58–59.)

Immediately after the men failed to take their hands out of their pockets—Edson testified it was "[p]robably a few seconds" and "[n]ot very long"—the officers "drew [their] service weapons" and repeated the command.  (Tr. 20, 55.)  Edson testified that all four of the men took their hands out of their pockets.  Letang Jr., Narcisse, and Alphonse "showed

[the officers] their hands." Dorlette, who was by this time next to the Acura, turned and pulled his hands out of his pockets, and, on Edson's command, put his hands on the top of the Acura. (Tr. 20.) Edson then began to pat down the four men while Phillips covered them with his gun.

Edson summarized the basis for his suspicion of the four men:

We rounded the block, we see the two individuals in the middle of the street, we thought it could possibly be the two individuals that were there earlier. We thought a fight was going to happen. We go down the street to try and prevent a fight from happening. We are just doing our job.

As we get closer, we realize it's the same four individuals and they're heading back to the car. They went inside. He's going to take care of it, they go inside. They go towards the apartment. I didn't see them go inside. It's possible they went in to retrieve a weapon, they're going out, now they're going to look for these two individuals. . . .

They were going back out, we believed it was possible they were going back out to look for these two individuals. . . .

This is what's in my head. It has to be in my head, it's officer safety. I'm going home at the end of the night. So, we got out, we thought a fight was possible, it could happen. The totality of the circumstances led us to believe there was definitely a fight that could happen. . . . A fight. An individual is getting into a fistfight or weapons could be used, someone getting hurt. . . .

They just stood there, looked at each other, kept their hands in their pockets. Immediately, officer safety. I'm going home at the end of the night. We draw down on these guys, I conduct a quick pat down of these individuals, sure enough we find a gun on Mr. Dorlette.

(Tr. 60–63.) He agreed he did not know if the men were "going out to take care of . . . the situation," whether they had "already taken care of it," or whether they had "done so by telephone," and that the officers did not ask them any questions. (Tr. 63–64.)

Phillips, by contrast, testified that he became suspicious merely because the men did not take their hands out of their pockets, which command the officers gave "just for safety purposes":

> Q.   [W]hen you asked them to "show us your hands," how did you say that? How was that communicated?
>
> A.   It is pretty common. First time, you know, "Guys, take your hands out of your pockets for us." When they didn't, that's what aroused our suspicion that something was going on. Most times most people's reactions is "Okay, yes, officer," they'll take their hands out of their pocket.
>
> Q.   And that did not happen?
>
> A.   It did not.
>
> Q.   What happened then? At some point did they show you their hands?
>
> A.   Yes, they did. At that point we drew down our service weapons and ordered them to take their hands out of their pockets, which at that point they all did.

(Tr. 79–80.)

Narcisse and Letang Jr. testified that immediately upon getting out of the patrol car, the officers drew their guns and demanded that the four men take their hands out of their pockets, without first asking them to do so without their weapons drawn. Letang Jr. testified that the officers "just hopped out" of the patrol car, and Edson "yelled out, 'Don't move or I'm going to blow your head off.' Then [Phillips] said, 'Don't move.' That's when he pulled out his gun also." (Tr. at 159 (Letang Jr.).)[4] Letang Jr.'s testimony was compelling. He stated that when the officers pulled out their guns,

---

[4] Letang Jr. did not know the names of the officers, but it is clear from his description of them, and the officers' appearance, who he meant. The one Letang Jr. described as "look[ing] like a rookie" and being "a little bit tall and slimmer" is Phillips, and the officer who "was shorter [and] a little bit wider" is Edson. (*See* Tr. 159 (Letang Jr.).)

> So, I mean, at th[at] moment I was scared for my life, you know.  A police officer in front of me saying that he'll blow my head off at four in the morning, I mean, I don't know what he is going to do.  So I put my hands — he said, "Put your hands up."  So I put my hands up.  And he came closer to me and grabbed me up and said, "Put your hands against the car."  I put my hands against the car and they proceeded searching me.  I was fine.  They searched — he searched everyone.

(Tr. 159 (Letang Jr.).)  He was steadfast that the officers' first move after getting out of the patrol car was to draw their weapons and demand that the men raise their hands.  He said Edson gave the men an ultimatum—"[t]hat he'll blow our heads off" if they moved—that drew everyone's attention.  (Tr. 161, 176 (Letang Jr.); *accord id.* at 185 ("I'm about to open the [car] door, I just hear them, 'Don't move or I'll blow your brains out.'  I was just in shock. I just—I didn't even say a word." (Letang Jr.)).)  Letang Jr. testified that the officers only asked the men once to take their hands out of their pockets:

> I mean, they only had to say it to me once.  So, I mean, how they came out and said it, I mean, I don't think you want them to say it to you again because you don't know how they'll react, and I don't know what was going — I don't know what that police officer was going through that day.  He could have had a family problem and he could have [taken] it out on one of us.  So, I mean, I reacted right away. . . .

> My first impression, I mean, to be honest with you, your Honor, I was scared. I never had a gun pointed in my face before with that kind of tone.  I never had a gun pointed in my face, period, but especially with that kind of tone. And, I mean, I watch a lot of TV, so, I mean, anything could have happened that night.  Anything could have happened.  Not on our behalf, not on my behalf, but it could have been on the officers' behalf.  So, I mean, I was scared.

(Tr. 183, 184 (Letang Jr.).)  Similarly, Narcisse testified that the officers "hopped out [of] their car" with "their guns drawn towards our direction."  (Tr. 116 (Narcisse); *accord id.* at 135, 145–46 (Narcisse).)  He testified that some time passed while the officers' guns were

aimed at the men but before the officers commanded them to put their hands in the air, but did not recall the officers saying anything else. (Tr. 136 (Narcisse).) He testified that the officers repeated the show–hands command "more than twice that night," including at least once with profanity, but that he was sure that the officers "had their guns out before they asked us to put our hands up" because "[i]t was a big thing" to see officers' having drawn their guns on him. (Tr. 146–48 (Narcisse).)

Edson and Phillips testified inconsistently about the pocket in which Dorlette was digging. At first Edson testified that Dorlette was digging in "his rib pocket." (Tr. 18–19) He then testified that Dorlette was digging in a pocket at his hips but that he found the gun in Dorlette's chest pocket. (Tr. 56.) Phillips also testified that Dorlette was digging in his hip pocket and that Edson found the gun in Dorlette's chest pocket. (Tr. 94.) Edson then testified, however, that Dorlette was digging into the chest pocket that contained the gun, which he knew because he "could see [Dorlette's] elbow." (Tr. 65–66.)

After the men took their hands out of their pockets, Phillips trained his gun on them while Edson patted them down—first Letang Jr., then Narcisse, then Alphonse, then Dorlette—and found a gun in the chest pocket of Dorlette's jacket. (Tr. 22, 56 (Edson); *accord* Tr. 81–84 (Phillips).) They arrested Dorlette, who reported to Edson a name that was not his. When backup officers arrived, one of them recognized Dorlette and correctly identified him to Edson. (Tr. 24–25 (Edson); *accord* Tr. 85–86 (Phillips).)

II.     Discussion

The parties agree that Dorlette was seized before Edson patted him down and discovered the gun in his jacket, but they dispute whether Dorlette's seizure was an investigative detention pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), or an arrest. *See*

10

*generally Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) (distinguishing the "[t]wo categories of seizures of the person implicating the protection of the Fourth Amendment").  They also disagree as to whether the seizure was supported by probable cause (if it was an arrest) or by reasonable suspicion (if it was a *Terry* stop).  Assuming *arguendo*, without deciding, that (1) the seizure was a *Terry* stop, (2) Edson's testimony was accurate that he ordered the four men to remove their hands from their pockets once before he and Phillips drew their service weapons and repeated the command, and (3) the *Terry* stop did not occur until the officers drew their service weapons, the officers violated the Fourth Amendment by stopping Dorlette without reasonable suspicion that criminal activity was afoot.  Therefore, Dorlette's motion must be granted.

> A.    Legal Principles

"A defendant seeking to suppress evidence seized during a warrantless search bears the burden of showing that he had a reasonable expectation of privacy in the place or object searched."  *United States v. Sparks*, 287 F. App'x 918, 919 (2d Cir. 2008).  The Government does not dispute that Dorlette had a reasonable expectation of privacy in his person; the search of a person is "a serious intrusion upon the sanctity of the person."  *Terry*, 392 U.S. at 17; *see also id.* at 16 ("it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.'"); *Hester v. United States*, 265 U.S. 57, 59 (1924) (holding that the Fourth Amendment accords "special protection . . . to the people in their 'persons, houses, papers and effects.'" (quoting U.S. Const. amend. IV)); *see also Oliver v. United States*, 466 U.S. 170, 178 (1984) ("reaffirm[ing]" "the rule of *Hester*").  Dorlette having shown a reasonable expectation of privacy in his person, "the burden shifts

to the government to show that the search fell within one of the exceptions to the warrant requirement." *Sparks*, 287 F. App'x at 919 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973), and *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993)).  Where, as here, an "arrest follows an investigatory stop, the Government bears the burden of demonstrating both that there was reasonable suspicion for the stop and probable cause for the arrest." *United States v. Ferguson*, 130 F. Supp. 2d 560, 565–66 (S.D.N.Y. 2001) (citing, *inter alia*, *Perea*, 986 F.2d at 644–45, and *United States v. Pena*, 961 F.2d 333, 338–39 (2d Cir. 1992)).

"[T]he Fourth Amendment requires at least a minimal level of objective justification for making [a *Terry*] stop.  The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000). "[A]n investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures" so long as

> two conditions are met.  First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense.  Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.

*Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009).  The search and seizure are related but independent Fourth Amendment events, and an officer must justify *each* of these "particular intrusion[s]" by "point[ing] to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.  In *Terry* itself the Supreme Court made this distinction, explaining that "[t]he crux of th[e] case, however, is not the propriety of Officer McFadden's taking steps to investigate

petitioner's suspicious behavior, but rather, whether there was justification for McFadden's invasion of Terry's personal security by searching him for weapons in the course of that investigation." *Id.* at 23. Thus, in *United States v. Simmons*, 560 F.3d 98 (2d Cir. 2009), the Second Circuit, relying on *Johnson*, proceeded to analyze two distinct questions raised by a *Terry* stop-and-frisk: first, whether the stop (seizure) was justified by "reasonable suspicion for the stop of Simmons," and second, "[t]he next question" of whether the frisk (search) was justified by "reasonable suspicion to frisk Simmons." *See id.* at 107–08; *see also, e.g.*, *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007) ("Under *Terry* . . . police may briefly *detain* an individual for questioning if they have a reasonable suspicion that *criminal activity is afoot*, and may *frisk* him if they reasonably believe he is *armed and dangerous*." (emphases added)).

These cases stand for the proposition that an officer may "act instantly on reasonable suspicion that the persons temporarily detained are armed and dangerous" by conducting "a limited search of outer clothing for weapons," but *only if* the officer has "already lawfully stopped" the person pursuant to "suspicion (reasonably grounded, but short of probable cause) that criminal activity is afoot." *Johnson*, 129 S. Ct. at 786. A seizure (stop) is justified by reasonable suspicion of criminal activity, while a search (frisk) may be justified by a concern for the officer's safety, grounded in a reasonable suspicion that the person stopped is "armed and dangerous." *Johnson*, 129 S. Ct. at 784. An interest in officer safety, however, cannot *by itself* justify a *Terry* stop *ab initio* without "a reasonable belief that the suspect poses a danger," *see, e.g.*, *Michigan v. Long*, 463 U.S. 1032, 1049 (1983), since the Fourth Amendment permits an officer to conduct "a protective search"—the purpose of which is usually to protect his and the government's "interest in officer safety," and which is an

"*additional* intrusion" on the rights of the person searched, *Johnson*, 129 S. Ct. at 786 (emphasis added)—only "*assuming* a proper stopping for investigation." 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.6 (4th ed. supp. 2009) (emphasis added). Consistent with this rule, the Supreme Court has permitted conduct—usually, but not always, a frisk—based on a concern for officer safety *only after* an otherwise lawful seizure has occurred. *See, e.g., Terry*, 392 U.S. at 23; *Knowles v. Iowa*, 525 U.S. 113, 117–18 (1998) ("concern for officer safety in this context may justify the 'minimal' *additional* intrusion of ordering a driver and passengers out of the car" after a lawful "routine traffic stop").

Thus, although an "interest in officer safety has been the justification for *Terry* stops from their inception," *United States v. McCargo*, 464 F.3d 192, 200 (2d Cir. 2006), Supreme Court precedent makes clear that that concern cannot provide justification for the stop *unless* the officer's concern for safety is based on or accompanies a reasonable suspicion "that criminal activity is afoot," *Johnson*, 129 S. Ct. at 784; *Terry*, 392 U.S. at 30. *See New York v. Class*, 475 U.S. 106, 117 (1986) ("When a search or seizure has as its immediate object a search for a weapon[,] . . . the weighty interest in the safety of police officers [may] justify warrantless searches *based only on a reasonable suspicion of criminal activity.*" (emphasis added)).[5] In sum, *Terry* and its progeny do not permit a police officer to justify a stop on a

_____

[5] Indeed, *McCargo* is consistent with this analysis. In *McCargo*, officers first stopped the suspect, then frisked him (whereupon they found a gun), and then transported him a short distance to the scene of a reported crime. The Second Circuit held all three actions to be constitutional. First, the officers' initial *Terry* stop was justified because the officers "had a reasonable suspicion that McCargo was involved in *criminal activity* and, therefore, the initial *Terry* stop was constitutional." 464 F.3d at 197 (emphasis added). The court made its observation that officer safety is a justification for *Terry* stops, in service of a conclusion that the frisk of McCargo—who the officers had *already lawfully detained* on the basis of a

14

concern for officer safety that is untethered to a reasonable suspicion of criminal activity. *See United States v. Swindle*, 407 F.3d 562, 567–68 (2d Cir. 2005) ("a police officer should not be empowered to order someone to stop unless the officer reasonably suspects the person of being engaged in illegal activity. We find this position most faithful to *Terry*'s own prescription that, when stopping a suspect, a police 'officer's action [be] justified at its inception.'" (quoting *Terry*, 392 U.S. at 20; alterations in *Swindle*)); *see also United States v. Muhammad*, 463 F.3d 115, 123 (2006) (officers "were entitled to conduct a patdown search" only "*following* Muhammad's problematic response to their query," which itself occurred only *after* "the officers properly stopped Muhammad" (emphasis added)); *United States v. Noble*, No. 08–3120, 2010 WL 545458, *3 (6th Cir. Feb. 16, 2010) ("Although an officer does not have the authority to automatically perform a pat down of a person stopped for a vehicular violation, we have found, in comparable situations, that a pat down during a traffic stop is reasonable when additional facts are present which indicate that the person may be armed.").

B.    The Stop

Because a person is not seized unless he actually yields to "a show of authority," *California v. Hodari D.*, 499 U.S. 621, 626 (1991), "an unreasonable order to stop does not violate the Fourth Amendment and . . . the grounds for a stop may thus be based on events that occur after the order to stop is given" if the suspect does not obey the order, *Swindle*, 407 F.3d at 568.

Here, according to Edson, the officers made "a show of authority" by asking, without their weapons drawn, for the men to show their hands, but Dorlette did not yield to this

suspicion of criminal activity—was constitutional.  *See id.* at 199–201.

show of authority.  "[A] few seconds" later, the officers repeated the command with their weapons drawn, in response to which the men stopped and obeyed.  At the latest, then, the stop—a seizure—occurred when the officers drew their service weapons.  This stop was justified by neither the events preceding the officers' first show–hands order, nor between that order and their second show–hands order accompanied by drawn service weapons.

First, as the officers drove down Diaz Street for the third time, during which they approached the four men for the second time (the "second approach"), they realized before they arrived at 38 Diaz Street that the men were the same four whom they had seen just a minute before, during their second drive down Diaz Street when they approached the four men for the first time (the "first approach").  During the officers' first approach they saw a car drive down the street and thought it might contain the men who Letang Sr. had previously reported.  But when they approached, the officers saw four men get out of the car and learned that they were not the ones who had reportedly kicked on the door.  They believed Letang Jr.'s report of his identity and relationship to Letang Sr.; the officers had a brief discussion with Letang Jr., asked him to call the SPD if necessary, and left the scene.  This interaction provided no grounds for the officers to suspect Letang Jr. or his friends of any criminal activity, and the officers did not testify that they did have any such suspicion.

"[A] minute or two later," when the officers again drove down Diaz Street and saw two men standing in the street, they realized the men were the same friends of Letang Jr. whom they had seen minutes before.  Although nothing had changed in the minutes between their first and second approach other than the passage of one or two minutes and the direction in which the men were heading (i.e., toward the car instead away from it), the

16

officers immediately got out of the car and asked them to show their hands "for officer safety."

Neither Edson nor Phillips could point to any "specific and articulable facts which, taken together with rational inferences from those facts," *Terry*, 392 U.S. at 21, gave rise to any reasonable suspicion that the men were, or were about to be, engaged in criminal activity. Instead, each repeatedly referred to their concern for officer safety, which, as explained above, is alone insufficient to justify the stop unless it relates to a reasonable suspicion of criminal wrongdoing.[6] At most, Letang Jr. was "nervous." However, while "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Wardlow*, 528 U.S. at 124, the officers never testified that *Dorlette* acted nervously, and because to support a *Terry* stop the officers' claimed reasonable suspicion must be "particularized" to the person seized, *id.*, Letang Jr.'s nervousness provides no grounds to have seized Dorlette. Nor did the officers point to other facts supporting a reasonable suspicion of Dorlette. They did not, for example, testify that they encountered the four men in a high–crime area, which, while "standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," is at least relevant to a reasonable–suspicion analysis, *see id.*

Instead, according to Edson, only a few seconds passed between the first show–hands order and the officers' decision to draw their guns, at which point they seized the men. In the interim, Dorlette did not change course or walk toward the officers; he "continued"

---

[6] In addition, at the moment of the first show–hands order, the situation presented no specific and articulable facts that would give rise to any reasonable suspicion that the men were "armed and dangerous," so the officers' inchoate fear for their safety did not, give rise to circumstances in which the officers could frisk the men.

walking in the same direction to toward the passenger side of the Acura.  Dorlette's actions show his "refusal to cooperate" with the officers' command, which, "without more, does not furnish the minimal level of objective justification needed for a detention or seizure" because a person "has a right to ignore the police and go about his business."  *Wardlow*, 528 U.S. at 125.  Edson testified that Dorlette did not acknowledge the officers, and instead "continued to walk away."  Both Phillips and Edson testified that they believed by walking away Dorlette was attempting to use the car to separate himself from them, and Edson testified that he observed Dorlette "digging in his pocket . . . looking like he was trying to get rid of something."  However, neither officer testified that he believed Dorlette was doing anything criminal, and further, neither testified that he could or did draw such an inference from the fact that Dorlette was moving away and digging in his pocket.  Edson or Phillips also did not rely on observations or conclusions as "trained, experienced police officer[s] who [are] able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer."  *See, e.g.*, *Brown v. Texas*, 443 U.S. 47, 52 n.2 (1979); *cf. United States v. Arvizu*, 534 U.S. 266, 269–71, 273, 276 (2002) (describing why certain facts were "significant" to a border patrol agent in light of agent's experience and therefore gave rise to reasonable suspicion, and explaining that "officers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'" (internal quotations omitted)); *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (court must "give due weight to inferences drawn from . . . facts by . . . local law enforcement officers").

The sum total of facts available to Edson and Phillips when they drew their guns on Dorlette was that he had refused to stop moving toward the car, that he refused to take his

18

hands out of his pockets on a cold night within seconds of the first show–hands order, and that he was digging into his pockets.  The officers did not testify that at any time they believed that Dorlette was, or was about to be, engaged in criminal activity.

Edson testified that it was possible that the men had gone into the Letangs' apartment to get weapons with the intent to get into a fight, but this was mere speculation—an "inchoate and unparticularized suspicion or hunch" that was not a reasonable inference drawn from any "articulable facts" known to the officers.  This inchoate hunch does not justify the investigatory stop.  *See, e.g.*, *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Wardlow*, 528 U.S. at 123–24.  In testimony Edson speculated that in the one minute between the officers' first and second approach the four men may have gone into the Diaz Street apartment, obtained weapons, and turned back to the Acura to go search for a fight.  He said a "fight was possible, it could happen," but he did not know whether the four men had even gone into the apartment in the brief time between the officers' first and second approaches, had no factual basis to believe they had retrieved weapons, agreed that he did not know what the four men were going to do, and conceded that neither he nor Phillips asked Dorlette, or any of them, any questions at all before ordering the four men to show their hands, even though "[a]sking questions is an essential part of police investigations," *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County*, 542 U.S. 177, 185 (2004).  Having simply squared the block and learned nothing more about the situation, Edson and Phillips clearly lacked any "articulable facts" on which to base any reasonable suspicion that Dorlette was about to be engaged in criminal activity.  Instead, Edson's surmise that Dorlette may have been looking for a fight was an "inchoate . . . hunch" that does not provide justification for the *Terry* stop.

Comparison to the recent Second Circuit case *Simmons* is instructive.  In that case, at 4:25 a.m. officers received an anonymous tip of "an assault, possibly with a weapon, [that] was in progress" at a nearby apartment building.  The dispatcher relayed to the officers that "[t]here is a possible gun involved," and described the race (African–American), gender (male), and clothing ("a grey hoody, black jacket") of the suspect.  *Simmons*, 560 F.3d at 101 (internal quotations omitted).  One of the arresting officers testified that the apartment building was in "a neighborhood that has a problem with drugs, shots fired, and . . . a gang presence."  The officers arrived at the building, saw no assault taking place, and asked the people outside the building whether an assault was in progress.  The answer was "no."  The officers "then approached the front entrance of the building" and saw three people, including one, Simmons, who matched the anonymous tipster's description.  "Simmons began walking toward them with his hands in his jacket pockets."  One officer ordered Simmons to stop, but Simmons "continued walking."  The officer repeated the command, "and Simmons stopped."  The officer instructed Simmons to show his hands, an instruction Simmons ignored.  The officer repeated the command, and again Simmons ignored it.  The officer then physically "'grabbed over to' Simmons' right side" and discovered a gun, after which the two officers arrested Simmons.  *Id.*

The Second Circuit held that "while the case is close, we find that the officers had reasonable suspicion for the stop of Simmons," which they held occurred when  Simmons "complied with the officer's second order to stop."  *Id.* at 107.  The "totality of the circumstances" the court observed were: (1) an anonymous tip of "an ongoing emergency," which the court "accorded a higher degree of reliability" and for which it "require[d] a lesser showing of corroboration"; (2) the fact that the tip was of an ongoing assault with a weapon;

and "additional factors that supported the stop," including (3) the officers' encountering Simmons "along with a gathering of people at the apartment building, late at night, and in a high crime area," (4) that Simmons had "his hands in his pockets," which "could have suggested to the officers that Simmons was concealing a weapon, especially since the dispatcher reported that the suspect may have perpetrated an assault with a weapon," and (5) "Simmons' non-compliance with the first order to stop," which, "when viewed in light of the circumstances, reinforced the officers' determination that he may have been engaged in criminal activity." *Id.* at 107–08. The court held that "[i]n the context of the emergency 911 call here, the totality of circumstances support the conclusion that the officers had reasonable suspicion to stop Simmons." *Id.* at 108.

The officers' confrontation with Dorlette, by contrast, contains no circumstances similar or analogous to the ones that made the question in *Simmons* "close" except Dorlette's non-compliance with the first show–hands order, which the officers found troublesome purely for the possible risk to their safety, and not because it gave rise to a suspicion of criminal activity. *Cf. id.* at 107 (describing Simmons' "refusal to remove his hands" from his pockets as "arguably suspicious"). There was no emergency and no tip of any sort; there was no report of any weapons; there is no evidence that 38 Diaz Street is located in a high–crime area; there is no evidence that Dorlette was nervous; Dorlette was not "walking toward" the officers, as was Simmons; and the officers had already encountered the men just one or two minutes before, learned that the men were associated with Letang Sr., with whom they had spoken just minutes prior, and saw fit to leave the scene without even asking for any of their identification; and there was no objective indication that the four men had had, or had retrieved, any weapons.

21

Even if Dorlette's non-compliance with the first show–hands order has some weight in the reasonable–suspicion analysis notwithstanding that in *Simmons* the Second Circuit gave valence to "Simmons' non-compliance" only "when viewed in light of" circumstances not present in the encounter at issue here, *see* 560 F.3d at 108, Dorlette's non-compliance stands alone, "without more," *Wardlow*, 528 U.S. at 125, and indeed neither Edson nor Phillips testified that they believed it was consistent with criminal conduct.[7]   Such non-compliance is not an "'objective manifestation that [Dorlette] [wa]s, or [wa]s about to be, engaged in criminal activity," *Muhammad*, 463 F.3d at 121 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)), and it cannot bear the weight of showing that the officers had "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,'" *Sokolow*, 490 U.S. at 7.   The officers' stop of Dorlette therefore ran afoul of the Fourth Amendment.

*                *                *

---

[7] The Second Circuit has never held that a suspect's mere digging into pockets can give rise to reasonable suspicion, especially where, as here, the officers did not ever state a belief, drawn from that fact, that the suspect was or was about to be engaged in criminal activity.  *Cf. United States v. Padilla*, 548 F.3d 179, 187–88 (2d Cir. 2008) (reasonable suspicion where defendant "reach[ed] underneath his jacket and shirt, adjust[ed] something in the center of his waistband, and continue[d] walking," but only together with substantial other circumstances, including three men's "manner of walking" defendant "describe[d] as 'ostensibly suspicious'"; that they "walk[ed] onto an isolated, dark path at night rather than stay on the lighted sidewalks," which "seemed unusual for persons to travel by the path in that neighborhood after dark"; "[t]he high–crime nature of the neighborhood"; and that men exited the path "into a desolate area near another wooded lot which was similarly well–suited for a robbery"); *United States v. Gaynor*, 262 F. App'x 341, 342 (2d Cir. 2008) (reasonable suspicion where, "[w]hen Officer Cilento approached Gaynor, Gaynor became fidgety and nervous, and made several suspicious statements; and he reached into his jacket in a way that suggested that he might have been looking for a weapon").

22

The officers stopped and seized Dorlette out of a concern for their safety.  In his testimony Edson justified the stop-and-frisk of Dorlette, and the officers' engaging in it before asking questions, on the basis of his "concern[] about officer safety," which he grounded in "the totality of the circumstances that were going on."  (Tr. 49–50 (Edson).)  Edson did not testify that he believed any criminal activity was afoot.  Instead, he based his actions only on officer safety.  He testified that "what [he] thought was suspicious was when [he] told [the men] to remove their hands from their pockets *for officer safety* and they did not.  That's what I thought was suspicious.  *It's an officer safety issue.*"  (Tr. 47 (emphases added).)  He repeatedly explained that this was his concern, testifying that after the first show–hands order, the men "just stood there, looked at each other, kept their hands in their pockets.  *Immediately, officer safety.*  I'm going home at the end of the night.  We draw down on these guys, I conduct a quick pat down of these individuals, sure enough we find a gun on Mr. Dorlette."  (Tr. 63 (emphasis added).)  Similarly, Phillips testified that his "interest" in "see[ing] their hands" was only "[f]or safety purposes;" he said that after the four men dug their hands further into their pockets, he and Edson "asked them to show us their hands *just for safety purposes.*"  (Tr. 79 (emphasis added).)

The officers' concern for their safety, however, was unaccompanied by any articulable facts, or inferences drawn from them, that could give rise to a reasonable suspicion that Dorlette was, or was about to be, engaged in criminal activity.  Nor do they assert or provide grounds to conclude that their safety concern was tethered to a reasonable suspicion that criminal activity was afoot.  Indeed, aside from Edson's rank speculation that the men had obtained weapons from the Diaz Street apartment and were going out to search for a fight, criminal activity was not a concept that the officers' testimony suggests in any way drove

their stopping Dorlette.  Lacking reasonable suspicion to believe that criminal activity was afoot, the officers violated the Fourth Amendment when they stopped Dorlette.

III.    Conclusion

For the reasons stated above, the Government has failed to meet its burden "of demonstrating . . . that there was reasonable suspicion for the stop," *Ferguson*, 130 F. Supp. 2d at 565–66, and thereby "to show that the search fell within one of the exceptions to the warrant requirement," *Sparks*, 287 F. App'x at 919.  Therefore, Defendant Faroulh Dorlette's Motion to Suppress Evidence [Doc. # 14] is GRANTED.


IT IS SO ORDERED.


                            /s/
                            Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 5th day of April, 2010.